# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| ARLINGTON SCHOOL BOARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-1434 (RDA/LRV) |
| | ) | |
| LINDA McMAHON, Secretary of the | ) | |
| Department of Education, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director                                                    ERIK S. SIEBERT
Civil Division, Federal Programs Branch     United States Attorney

GARRY HARTLIEB                                   MATTHEW J. MEZGER
Trial Attorney                                          Assistant United States Attorney
United States Department of Justice          Office of the United States Attorney
Civil Division, Federal Programs Branch     2100 Jamieson Ave.
1100 L Street, NW                                   Alexandria, VA 22314
Washington, DC 20005                             Tel:    (703) 299-3741
Tel: (202) 305-0568                                  Fax:   (703) 299-3983
E-mail:  Garry.Hartlieb2@usdoj.gov          Email:  Matthew.Mezger@usdoj.gov

*Counsel for Defendants*

## INTRODUCTION

After the Defendants placed Plaintiff on "high risk" status for problematic policies that run afoul Title IX (which results in federal funding being disbursed on a reimbursement only status), Plaintiff rushed into court over a holiday weekend seeking emergency relief in the form of a temporary restraining order that is reserved for the most extraordinary cases, based on the incorrect premise that they were about to lose federal funding. But Plaintiff is entitled to nothing. For starters, this case can begin and end with one word: jurisdiction. Plaintiff alone has the burden of demonstrating that this court has the power to hear the case and it has not come close to doing so. First, whether to place an entity on "high risk" status (and receiving money in the form is reimbursement) is an action committed to agency discretion and not reviewable under the Administrative Procedure Act ("APA"). Second, to the extent that any court has jurisdiction to hear Plaintiff's claim, it is not this one. That is because the claim at its essence is a contractual one where Plaintiff is claiming that the federal government did not provide money in a timely manner. These types of claims belong to the Court of Federal Claims pursuant to the Tucker Act. Third, Plaintiff cannot creatively plead around these jurisdictional bars through the Declaratory Judgment Act and the declaratory judgment actions cannot waiver sovereign immunity. Finally, in Plaintiff's haste to sue the United States, it failed to avail itself of the administrative remedies available through the agency as they are required to before seeking emergency relief.

Those jurisdictional bars are game, set, match for this case and the Court need not look further. But if it does, there is more reason to deny relief. First, Plaintiff's claims fail on the merits because (1) the Defendants' actions were reasonably explained, (2) to the extent *Grimm* remains good law, this case can be distinguished, and (3) the spending clause claim fails on its face. And just as importantly, Plaintiff cannot establish irreparable harm. Plaintiff's own evidence indicates that it will be reimbursed with funds and simply must pay up front in the meantime. It presents no

evidence that any of its programs are in jeopardy because of the change of this payment system in a manner that cannot be remedied at the end of the litigation. Finally, the balance of equities weighs in favor of the United States as once funds are dispersed, the United States cannot receive them on the back end if it determines a payment to a high-risk entity is inappropriate.

The bottom line is Plaintiff should not have rushed into court and should have instead exercised its options with the agency (the only options afforded to Plaintiff as a matter of law). The court should deny all relief.

## BACKGROUND

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulation at 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in any program or activity receiving federal financial assistance. The Department of Education's Office for Civil Rights ("OCR") enforces Title IX. As recipients of federal financial assistance from the Department of Education, public school systems such as Plaintiff must comply with this law. It is the Department's fiduciary duty to ensure taxpayer dollars are not being spent on illegal activity. *Arlington School Board* ("*ASB*") *v. McMahon*, 1:25-cv-1434, ECF No. 1-3 (E.D. Va.).

Under the General Education Provisions Act ("GEPA"), section 423 (20 U.S.C. § 1226a-1) the Secretary of Education may determine the method of payment, including reimbursement, under a grant program. DEX 1, Declaration of Murray Bessette at ¶ 3. Under the Uniform Guidance applicable to federal agencies, including the Department of Education ("ED"), the Department may adjust specific conditions imposed on grant recipients, and specific conditions may include requiring payments as reimbursements rather than advance payments (2 C.F.R. § 200.208). *Id.* Under regulation applicable to the Department, 2 C.F.R. § 3474.10, the Secretary may designate

specific conditions as "high-risk conditions" and may designate a non-Federal entity subject to specific conditions as "high-risk." *Id.*

Plaintiff enacted a policy that OCR determined does not comply with Title IX. The policy at issue went into effect between 2019 and 2020. *See ASB v. McMahon*, ECF No. 1-6 at 2 (ASB policy J-2 PIP-2 went into effect on July 1, 2019, after approval by the Arlington School Board); *id.* at ECF No. 1-4 (ASB J-2 PIP-2 policy); *Fairfax County School Board* ("*FCSB*") *v. McMahon*, 1:25-cv-1432, ECF No. 1-3 (E.D. Va.) (FCPS Regulation 2603.2 "Gender-expansive and Transgender Students" went into effect October 2020); *id.* at ECF No. 1 ¶ 39.

OCR received a complaint that Plaintiff's policy or those similar thereto violate Title IX. *See FCSB v. McMahon*, ECF No. 1-5 (indicating complaint was received on February 4, 2025). The complaint against FCSB alleged that its anti-discrimination policy pertaining to transgender students "provides greater rights to students whose 'gender identity' does not match their biological sex than it does to students whose 'gender identity' matches their biological sex," and that Division Regulation 2603.2, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX. *FCSB v. McMahon*, ECF No. 1-5.

As a result of these complaints, on February 12, 2025, OCR notified Plaintiff that it opened investigation into Plaintiff under Title IX. *FCSB v. McMahon*, ECF No. 3-2; *ASB v. McMahon*, ECF No. 1-5. As to ASB, OCR indicated it would investigate whether ASB's "Transgender Students in Schools" policy, which relates in part to the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX. *ASB v. McMahon*, ECF No. 1-5. As to FCSB, OCR explained it would investigate whether its Regulation 2603.2, which relates in part to

the use of intimate, sex segregated facilities, including restrooms and locker rooms, violates Title IX. *FCSB v. McMahon*, ECF No. 3-2.

Pursuant to those investigations, OCR requested initial data for its investigations on February 24, 2025, and requested responses by March 17, 2025. *FCSB v. McMahon*, ECF No. 3-3; *ASB v. McMahon*, ECF No. 1-5. On March 20, 2025, ASB sent a letter to OCR indicating it made an initial production of responsive documents on March 17, 2020, which it supplemented on March 20, 2020. *ASB v. McMahon*, ECF No. 1-6. On March 24, 2025, FCSB sent a letter to OCR indicating it made an initial production of responsive documents on March 17, 2020, which it supplemented on March 24, 2020. *FCSB v. McMahon*, ECF No. 3-4.

OCR completed its investigation into the complaint it received about Plaintiff's policy. In reaching a determination, OCR reviewed publicly available information, information provided by the Complainant, and documents provided by Plaintiff. *FCSB v. McMahon*, ECF No. 3-5 at 2; *ASB v. McMahon*, ECF No. 1-7 at 2. As to FCSB, OCR learned that one student filed a lawsuit just before the start of the 2024-2025 school year, which was subsequently joined by three additional students, alleging that Regulation 2603.2 violated their free speech, free exercise, due process, and equal protection rights because it required students to share a restroom with someone who is trans-identifying or, alternatively, use single-use restrooms. *FCSB v. McMahon*, ECF No. 3-5 at 5. OCR found that as a result of Plaintiff's regulation, one of the students "avoided using school restrooms and only did so when absolutely necessary." *Id.*

After carefully considering all of the information obtained during the investigation, OCR found that Plaintiff is in violation of Title IX and its implementing regulations. *Id.* On July 25, 2025, OCR sent Plaintiff a letter outlining the factual background of Plaintiff's policy, the nature of the complaints made against Plaintiffs, the applicable legal standards regarding sex

discrimination under Title IX, and applied the facts to the standard, ultimately concluding that Plaintiff's policy violated Title IX. *FCSB v. McMahon*, ECF No. 3-5; *ASB v. McMahon*, ECF No. 1-7. OCR concluded that Plaintiff's policy is overbroad, and violates Title IX by not limiting its intimate-facilities policies to students that "consistently and persistently" assert a "gender identity." *FCSB v. McMahon*, ECF No. 3-5 at 19-20; *ASB v. McMahon*, ECF No. 1-7 at 19-20. In other words, OCR concluded that Plaintiff allows individuals that do not assert a consistent and persistent "gender identity" to use facilities of the opposite sex. *Id.*

OCR simultaneously provided a draft resolution agreement specifying the actions that, when taken by the Plaintiff, will remedy the violation of Title IX. *FCSB v. McMahon*, ECF No. 3-6; *ASB v. McMahon*, ECF No. 1-8. Given the serious violation of Title IX, OCR gave Plaintiff 10 days to "indicate[] a willingness to execute a resolution agreement." *FCSB v. McMahon*, ECF No. 3-5 at 21; *ASB v. McMahon*, ECF No. 1-7 at 21.

On July 29, 2025, Plaintiff submitted a response letter on behalf of itself and other districts, requesting an opportunity to negotiate for 90 calendar days. *FCSB v. McMahon*, ECF No. 3-7; *ASB v. McMahon*, ECF No. 1-9. Two days later, on July 31, 2025, OCR acknowledged Plaintiff's request, indicated there was no present impasse to negotiation, and that Plaintiff had the ability to continue to negotiate. *FCSB v. McMahon*, ECF No. 3-8; *ASB v. McMahon*, ECF No. 1-10. OCR set a deadline of August 15, 2025 for Plaintiff to indicate whether it "is willing to cons6ider agreeing to the terms in the draft resolution agreement." *Id.*

On the August 15th deadline, Plaintiff sent a letter stating that it "cannot agree to the terms of the Resolution Agreement" submitted by OCR. *FCSB v. McMahon*, ECF No. 3-9; *ASB v. McMahon*, ECF No. 1-11. ASB instead requested that OCR stay the matter until the case of *B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542, 550 (4th Cir.), *cert. granted sub nom.*

*W. Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (July 3, 2025), which is before the Supreme Court, is resolved. *ASB v. McMahon*, ECF No. 1-11 at 1. Three days later, APS sent a letter submitting additional authority for its position. *ASB v. McMahon*, ECF No. 1-12 at 1. While ASB's letters advocated for its position, neither letter requested any specific revised language to the proposed Resolution Agreement.

FCSB, by contrast, proposed that "OCR not refer this matter for enforcement while we continue our discussions regarding a potential Resolution Agreement," and requested that "OCR clarify the Resolution Agreement in light of the U.S. Supreme Court granting certiorari in *B.P.J.*" *FCSB v. McMahon*, ECF No. 3-9 at 1, 4. It substantially reiterated its position in a supplemental letter on August 18, 2025. *FCSB v. McMahon*, ECF No. 3-10. Like ASB, FCSB's letters did not offer alternative terms to the Resolution Agreement or propose what clarifying language would satisfy its concerns about *B.P.J.*

Absent Plaintiff's endorsement or suggested revisions to Having failed to receive alternative suggested language in the Resolution Agreement and given Plaintiff's refusal to sign the resolution agreement, on August 19, 2025, OCR submitted a letter to Plaintiff titled "High Risk Designation and Specific Conditions on Grants." *FCSB v. McMahon*, ECF No. 3-11; *ASB v. McMahon*, ECF No. 1-3. The letter informed Plaintiff that the Department of Education designated Plaintiff as a "high-risk" entity, under all of the programs administered by the Department for which Plaintiff receives funds, in accordance with 2 C.F.R. §§ 200.208 and 3474.10. *Id.* In making such determination, the Department of Education considered (1) "the possible magnitude of the potential gross mismanagement of public funds while violating applicable laws;" (2) "the improper organizational management and operations that led to the problems discussed [in the letter];" and

(3) "concerns regarding [Plaintiff]'s lack of proper controls." *FCSB v. McMahon*, ECF No. 3-11 at 2; *ASB v. McMahon*, ECF No. 1-3 at 2.

Concurrently with designating Plaintiff a "high-risk" entity, the Department of Education placed specific conditions on Plaintiff's use of funds in all grants it receives from the Department, namely, placing Plaintiff on a reimbursement method of payment. *Id.* Under "reimbursement," Plaintiff is required when it submits a request to drawdown funds for a particular obligation it intends to charge to a Department grant, submit to the Department or the appropriate State division detailed documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for by Plaintiff with non-Federal funds. *FCSB v. McMahon*, ECF No. 3-11 at 3; *ASB v. McMahon*, ECF No. 1-3 at 3. Plaintiff was also required to submit within 30 days plans for compliance with all federal laws and a proposed corrective action plan that shows all steps taken to be in compliance with the applicable laws. *Id.* The reimbursement model was not entirely new for Plaintiff; "Plaintiff already receives its federal formula grant funds under a reimbursement method of payment." DEX 1, Declaration of Murray Bessette at ¶ 6.

Neither the designation as high-risk nor the conditions imposed resulted in any grant cancellation, termination, block or a funding "freeze." DEX 1, Declaration of Murray Bessette at ¶¶ 4, 7. Nothing in the August 19 letter suggested that any future request for reimbursement would necessarily be denied. On the contrary, the letter explained how Plaintiff could have the reimbursement specific condition removed: put in place adequate corrective actions to the satisfaction of the Department, such that the Department could conclude that corrective actions have been working appropriately for a period of time that demonstrates assurance of effective compliance. *Id*. Notwithstanding the imposition of conditions, and consistent with its regulations codified at 2 C.F.R. § 200.208(d)(5), the Department of Education also provided Plaintiff the

opportunity to request reconsideration within ten business days. *FCSB v. McMahon*, ECF No. 3-11 at 4; *ASB v. McMahon*, ECF No. 1-3 at 4. Thus, Plaintiff had until the date Defendants submitted this brief to request reconsideration from the Department of Education. But Plaintiff never requested reconsideration. DEX 1, Declaration of Murray Bessette at ¶ 7. Instead, before the time for reconsideration had even expired, Plaintiff filed this action and sought a temporary restraining order on August 29, 2025.[1] *FCSB v. McMahon*, Compl. ECF No. 1; *ASB v. McMahon*, Compl. ECF No. 1.

## ARGUMENT

### I. No Restraining Order or Injunction Should Issue As Plaintiff Cannot Satisfy the Four Factors to Justify Equitable Relief

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). To obtain a preliminary injunction, Plaintiff must make a "clear showing" of each of the four factors: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in their favor; and (4) that the public interest favors the requested equitable relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) ("The standard for granting either a TRO or a preliminary injunction is the same.").

As the Fourth Circuit recently emphasized, the "*Winter* test is supposed to set a high bar." *Am. Fed. of Teachers v. Bessent*, --F.4th---, 2025 WL 2313244, at *3 (4th Cir. Aug. 12, 2025). Granting an injunction "should be 'the exception,' not 'the rule.'" *Id.* (quoting *Munaf v. Geren*,

---

[1] Plaintiff did not notify or otherwise serve Defendant or its counsel with a copy of the Complaint or its Motion for a Temporary Restraining Order, which were filed the Friday before Labor Day weekend.

553 U.S. 673, 690 (2008)). Thus, should Plaintiff fail to meet its burden as to any *one* of these factors, this Court *must* deny the extraordinary request for an injunction. *Id.*; *accord N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 497 (4th Cir. 2025) ("Denying a preliminary injunction only takes the rejection of a single factor." (citation omitted)). That becomes a more arduous burden in a case like this where Plaintiff's claims rest upon successful establishment of multiple independent issues. *Am. Fed. of Teachers*, --F.4th---, 2025 WL 2313244, at *3 ("The plaintiff must therefore show an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall—otherwise, the product of the probabilities will be too low.").

With these principles in mind, Plaintiff cannot meet its burden to justify injunctive relief.

## A.    Plaintiff Cannot Establish a Likelihood of Success on the Merits

### 1.    Plaintiff Cannot Establish Jurisdiction Over its APA Claims for Two Independent Reasons

Without establishing the jurisdiction of this court, Plaintiff cannot succeed on the merits. "[T]he party invoking a federal court's jurisdiction has the burden of proving it. Federal courts start from the presumption that they lack such jurisdiction." *U.S. Confer. of Catholic Bishops v. U.S. Dep't of State*, 1:25-cv-00465, ---F. Supp. 3d ---, 2025 WL 763738, at *3 (D.D.C. 2025) (citation omitted); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Plaintiff has presented nothing to rebut the presumption that this court lacks jurisdiction. As a general matter, the APA creates a *limited* cause of action. The APA does not independently provide this Court with jurisdiction; it instead waives the federal government's sovereign immunity for a limited set of suits, brought by a person alleging a legal wrong because of agency action to obtain relief other than money damages. 5 U.S.C. § 702; *Califano v. Sanders*, 430 U.S. 99, 106-07 (1977). Thus, to invoke this Court's jurisdiction, a party seeking review of any action must point to a provision within the APA that authorizes judicial review of the relevant agency's action to invoke

this Court's jurisdiction. *NAACP v. Bureau of the Census*, 945 F.3d 183, 191 (4th Cir. 2019) (holding that failing to identify agency actions eligible for review under the APA is a "jurisdictional defect"); *Lee v. USCIS*, 592 F.3d 612, 618-19 (4th Cir. 2010) (affirming dismissal for lack of jurisdiction because the agency action was not eligible for review under the APA). Plaintiff's APA claim misses the mark in two key respects. First, ED's designation determinations is a type of agency action that is "committed to agency discretion by law" and thus it cannot be reviewed. Second, Plaintiff's claim is one that is effectively for damages such that the Court of Federal Claims is the *exclusive* forum to hear Plaintiff's claims.

   ***Agency Discretion as a Matter of Law***.  Although the APA can present an avenue for agency action to be judicially reviewed, "under § 701(a)(2), agency action is not subject to judicial review 'to the extent' that such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993). In *Lincoln*, the Supreme Court held that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," and thus such a decision is not reviewable under the APA. *Id.* at 192. And while "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ." *Id.* at 193. But so long the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review. *Id.*

   In *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), the D.C. Circuit extended its logic to more specific appropriations, holding that where Congress "left to the Secretary the decision about how the moneys" appropriated for a particular program "could best be distributed consistent with" the governing statute, such decisions were not subject to judicial review under the

APA. *Id.* at 751-52. *Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.) ("*Milk Train* thus makes quite clear that even funding decisions related to a specific appropriation for a specific program can be properly deemed committed to agency discretion."). Accordingly, ED's decision to designate Plaintiff as "high risk" is not reviewable under the APA.

The operative statute that ED utilized to exercise this authority plainly leaves the decision for how payments are made to the Secretary's discretion. *See* 20 U.S.C. § 1226a-1 ("Payments pursuant to grants or contracts under *any* applicable program may be made . . . by way of reimbursement . . . as the Secretary *may determine*." (emphases added)); *see also Polfliet v. Cuccinelli*, 955 F.3d 377, 382 (4th Cir. 2020) (holding that when Congress uses "may" in a statute, that confers discretion). The process is codified in 2 C.F.R. §§ 200.208 and 3474.10, and there is no argument from Plaintiff that ED did not follow the regulatory process in this case. It is also noteworthy that there is no qualifying language within the statute that limits how the Secretary may utilizes her discretion. And the absence of any qualifying language combined with "terms indicating discretion" means the statute "unambiguously specifies discretion in detail." *Polfliet*, 955 F.3d at 382.

The upshot is that the matter is explicitly conferred to agency discretion and Plaintiff does not have a cause of action under the APA.

***Plaintiff's Only Possible Cause of Action is in the Court of Federal Claims***.  The APA provides a right of action to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). However, it crucially provides review of only "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Thus, when a party already has an "available remedy," the party's APA

claim cannot proceed. *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996). To start, the "availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for [5 U.S.C.] § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005). And for this reason, recent precedent confirms the obligation of courts to assess whether "the relief request is not an incident of, or collateral to, a monetary award." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023) (cleaned up) (quoting *Randall v. United States*, 95 F.3d 339, 344-45 (4th Cir. 1996)); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.").

Though Plaintiff maintains that it is only seeking injunctive relief and bringing an APA claim, the reality is that its claim is one for money damages. Recent Supreme Court precedent and Fourth Circuit authority confirm this. *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025); *Sustainability Inst. v. Trump*, 2025 WL 1587100 (4th Cir. June 5, 2025). In *Dep't of Educ. v. California*, 145 S. Ct. 966 (Apr. 4, 2025), the Supreme Court stayed a TRO entered by the district court "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at 968. The Supreme Court found that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)). The Fourth Circuit in *Sustainability Institute*, relying on *California*, similarly stayed a preliminary injunction the district court issued involving grant terminations based on similar reasoning. 2025

WL 1587100, at *2; *see also Am. Assoc. of Colls. for Teacher Educ. v. McMahon*, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025) (similar).

The reasoning of these decisions still applies here irrespective of whether a "high risk" designation is part of the claim. That is because at its core, this case is about the terms under which Plaintiff receives money. Indeed, Plaintiff seeks an injunction to eliminate what it views as an unlawful "conditioning and freezing of federal funds." *ASB v. McMahon*, Compl. at 26 (prayer for relief); *FCSB v. McMahon*, Compl. at 27 (prayer for relief). To the extent ED has breached those obligations, that is a claim that sounds in contract and should be resolved by the Court of Claims under the Tucker Act. *See Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 474-75 (4th Cir. 1983) ("[T]he Claims Court is the proper forum for this action, whether it is characterized as one in contract or one to interpret provisions of the Constitution, federal statutes, or regulations pertaining to the contract" in case where "the primary objective . . . [was] to recover money allegedly wrongfully withheld by the federal government"); *United States v. J&E Salvage Co.*, 55 F.3d 985, 987-88 (4th Cir. 1995) ("It is well-established . . . that disguised contract actions may not escape the CDA. . . . Neither contractors nor the government may bring a contract action in federal district claims in tort language or as some statutory or regulatory violation[.]"). Thus, this Court does not have jurisdiction over this claim and to the extent there is a cause of action at all, it should instead be resolved in the Court of Federal Claims.

     2.    <u>Plaintiff cannot establish this Court's jurisdiction over its claim under the Declaratory Judgment Act</u>

As with Plaintiff's APA claim, Plaintiff's claim under Declaratory Judgment Act must fail for lack of jurisdiction. For starters, Plaintiff cannot creatively plead around the APA's requirements that it not be an action committed to agency discretion or the Tucker Act's jurisdictional bar through a declaratory judgment action. "This court and its sister circuits will not

tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims." *Consol. Edison Co. of N.Y., Inc. v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385 (Fed. Cir. 2001). *See also A.E. Finley Assoc., Inc. v. United States*, 898 F.2d 1165, 1167 (6th Cir. 1990) ("[O]ne cannot circumvent exclusive jurisdiction in the Claims Court by suing simply for *declaratory* or injunctive relief in a case where such relief would be the equivalent of a judgment for money damages." (emphasis added)); *Rogers v. Ink*, 766 F.2d 430, 434 (10th Cir. 1985) ("A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, *declaratory* or mandatory relief where the thrust of the suit is to obtain money from the United States." (emphasis added)).

Setting that aside, Plaintiff also cannot establish jurisdiction under the Declaratory Judgment Act because the United States' sovereign immunity has not been waived for such claims. Supreme Court precedent makes plain that a waiver of immunity "must be unequivocally expressed in statutory text and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citation omitted); *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *accord Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024). Importantly, neither "[a] statute's legislative history" nor a command by executive officials create a waiver of sovereign immunity "that does not appear clearly in the statutory text." *Lane*, 518 U.S. at 192; *see also United States v. U.S. Fed. & Gaur. Co.*, 309 U.S. 506, 513-14 (1940). And because "waivers of sovereign immunity must be strictly construed" in favor of the sovereign, it is Plaintiff's burden to show that Congress, through express statutory text in the Declaratory Judgment Act, has waived the United States' sovereign immunity. *Wood v. United States*, 845 F.3d 123, 127 (4th Cir. 2017) (citing *Welch v. United States*, 409 U.S. 646, 651 (4th Cir. 2005)).

Accordingly, per *Moatz*, Plaintiff's Declaratory Judgment Act claim cannot succeed and must be dismissed as other courts in this circuit have ordered when reviewing Declaratory Judgment Act claims against the government. *See, e.g.*, *Golden & Zimmerman, LLC v. Domenech*, 599 F. Supp. 2d 702, 708 (E.D. Va. 2009), *aff'd*, 599 F.3d 426 (4th Cir. 2010) ("As defendants correctly point out "the Declaratory Judgment Act is not a waiver of sovereign immunity."); *Ocean Breeze Festival Park, Inc. v. Reich*, 853 F. Supp. 906, 917 (E.D. Va. 1994), *aff'd sub nom.*, *Va. Beach Policemen's Benevolent Assoc.*, 96 F.3d 1440 (4th Cir. 1996) (unpublished table opinion) ("Similarly, the Declaratory Judgment Act is not a waiver of sovereign immunity."); *Kennedy v. McDonald*, 2017 WL 3033298, at *2 (D.S.C. July 18, 2017) ("As the Court previously noted, the Declaratory Judgment Act does not operate as an express waiver of sovereign immunity because it neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief."); *Johnson v. Sessions*, 2017 WL 1207537, at *6 (D. Md. Apr. 3, 2017) (similar). Thus, no temporary restraining order or preliminary injunction should issue from Plaintiff's Declaratory Judgment Act claim.

3.    This Court Should Also Deny Emergency Relief Because Plaintiff Has Not Availed Itself of Available Administrative Remedies

The Court should also reject Plaintiff's request for emergency relief when it has not exhausted available administrative remedies before the agency. Requiring exhaustion of alternative remedies is a prudential restraint, as it allows agencies to exercise autonomy and discretion and prevents premature judicial intervention. *Cf. Strate v. A-1 Contractors*, 520 U.S. 438, 439 (1997) ("Rather, these cases prescribe a prudential, nonjurisdictional exhaustion rule requiring a federal court in which tribal-court jurisdiction is challenged to stay its hand, as a matter of comity, until after the tribal court has had an initial and full opportunity to determine its own jurisdiction.").

Here, Arlington has not asked for reconsideration by ED, as other school districts have. ED is individually reviewing those other reconsideration requests. DEX 1, Declaration of Murray Bessette at ¶ 7. Plaintiff may argue that there was no hope ED would be receptive to its claims, but that is unfounded. ED is actively reviewing other reconsideration requests. In response to ED's notice about the new conditions, Plaintiff argues that they did not have to comply with ED's conditions (*e.g.*, *FCSB v. McMahon*, Compl., ¶43) and after seeking a lengthy extension, Plaintiff next asked ED to delay its conditions pending the outcome of a Supreme Court case that will not be decided until next year. *ASB v. McMahon*, Compl., ¶¶ 47, 48; *FCSB v. McMahon*, Compl. ¶¶ 47, 48. Those are efforts to escape ED's grant conditions, not efforts to propose an alternative approach consistent with Fourth Circuit precedent and ED's concerns. ED's August 19 letter advised Plaintiff that it could "request reconsideration of its designation as 'high-risk', and the specific conditions set forth in this letter, by submitting a written request for reconsideration within ten business days of the date of the letter. *FCSB v. McMahon*, ECF No. 1-3; *ASB v. McMahon*, ECF No. 1-3.

Plaintiffs' decision to thrust an emergency motion on the Court before exhausting the available administrative appeal process should be rejected.

    4.    <u>Even if Plaintiff Met its Jurisdictional Burden Plaintiff Cannot Succeed on the Merits of its APA Claim</u>

The court need not wade into the merits of Plaintiff's claim and can end the inquiry on jurisdiction. But a review of ED's substantive determination shows that its determination withstands review under the APA. Compliance under the APA only "requires the agency to 'examine the relevant data and articulate a satisfactory explanation for its actions including a rational connection between the facts found and choice made." *Hints, Inc. v. Hirshfeld*, 2022 WL 874317, at *4 (E.D. Va. Mar. 23, 2022) (quoting *Casa de Md. v. U.S. Dep't of Homeland Sec.*, 924

F.3d 684, 703 (4th Cir. 2019)); *see also DHS v. Regs of Univ. of Cal.*, 591 U.S. 1, 68 (2020) (Kavanaugh, J., concurring in part) ("For purposes of arbitrary-and-capricious review, it does not matter whether the latest official explanation was two years ago or three years ago. What matters is whether the explanation was reasonable and followed the requisite procedures."). "If the agency provides such an explanation, the Court must uphold its decision." *Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 663 (E.D. Va. 2023) (*quoting Casa de Md.*, 924 F.3d at 703). ED's designation determination easily clears this hurdle.

ED plainly articulated its rationale for designating both Fairfax School District and Arlington School District as high-risk entities. *FCSB v. McMahon*, ECF No. 3-11; *ASB v. McMahon*, ECF No. 3-10. The school districts were unwilling "to make the necessary policy changes to come into compliance with Title IX." *FCSB v. McMahon*, ECF No. 3-11 at 1; *ASB v. McMahon*, ECF No. 3-10 at 1. And this was problematic as ED "identified systemic organization-wide concerns regarding lack of compliance with applicable law as your assurances for receiving the grant funds had indicated." *FCSB v. McMahon*, ECF No. 3-11 at 2; *ASB v. McMahon*, ECF No. 3-10 at 2. More specifically as reflected in ED's findings of fact and determinations, the two school district policies violate Title IX because the districts' policies "allow[] males to invade sensitive female-only spaces like bathrooms (and vice versa)," and thus "intentionally, or with deliberate indifference, endanger students' safety, privacy, and dignity." *FCSB v. McMahon*, ECF No. 3-5 at 13; *ASB v. McMahon*, ECF No. 3-4 at 13. Further considering ED's robust 22-page analysis, all of this is sufficient to withstand review under the APA.

Though Plaintiff tries to mount a series of claims that ED's determination is contrary to Title IX and the Constitution, each fails. First, contrary to Plaintiff's contention, ED's conclusion does not run afoul of the Fourth Circuit's construction of Title IX in *Grimm v. Gloucester Cnty.*

*Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020). *Grimm*, as confirmed by the Fourth Circuit just recently, was "limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently,' express a binary gender." *Id.* at 596; *accord Doe by Doe v. South Carolina*, 2025 WL 2375386, at*2 (4th Cir. Aug. 28, 2025) (stating that *Grimm* "held that a public school board's policy of requiring transgender students to use multi-stall 'restrooms matching their biological gender'"). In contrast, as discussed above, Fairfax's and Arlington's policies go further than restrooms: they reach *all* sex-based facilities—especially locker rooms. Given that *Grimm* does not reach facilities like locker rooms, Plaintiff cannot assert that it will succeed on the merits. That the Fourth Circuit limited its holding to restrooms confirms ED's view that the privacy interests of school children in locker rooms are different. "[R]equiring girls to undress or use the bathroom in the presence of boys, causes distress in girls, violates their right to privacy, and can deny girls equal access to benefits of educational programs and activities." *FCSB v. McMahon*, ECF No. 3-5 at 14; *ASB v. McMahon*, ECF No. 3-4 at 14.

Even separate from *Grimm*'s limited holding, its continued vitality is in doubt. Thus, it cannot be that Plaintiff will meet its likelihood of success on the merits when the legal landscape is poised to shift at any moment. Notably, the State of South Carolina has sought an emergency stay of the Fourth Circuit's decision in *Doe* and the Supreme Court has called for a response by this Friday, September 5, 2025. *See generally* No. 25A234, *South Carolina v. Doe* (S. Ct. 2025). Moreover, the Supreme Court has granted certiorari in *West Virginia v. B.P.J.*, No. 24-43 (S. Ct.), to provide determinative clarity on the meaning of Title XI as *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) undermined key tenets of *Grimm*'s reasoning and holding. Thus, all to say that Plaintiff will not be able to continually meet its burden of success on the merits through the longevity of this suit.

Second, Plaintiff's claim that ED offended the Constitution's Spending Clause lacks merit. While Plaintiff asserts that they will lose "the federal funds that Defendants have effectively frozen," *FCSB v. McMahon*, ECF No. 3 at 10; *ASB v. McMahon*, ECF No. 3 at 2, the Declaration of Murray Bessette shows it is wrong on its face. Plaintiff has not lost any funds as a result of being placed on "reimbursement," and there is no "imminent freeze, 'block,' or termination of Plaintiff's federal funds." DEX 1, Declaration of Murray Bessette at ¶ 7. Plaintiff's bald assertion that the Department has "cut[] off over $160 million in federal funding," *FCSB v. McMahon*, ECF No. 3 at 16; *ASB v. McMahon*, ECF No. 3 at 16, is not supported by any factual support in the record.

Plaintiff does not seriously attempt to show how this case runs afoul of the factors listed in *South Dakota v. Dole*, 483 U.S. 203, 211 (1987). Congress may use its broad powers under the Spending Clause to induce the states to behave in a certain way, by offering federal funds to states that agree to certain congressionally imposed conditions. *See New York v. United States*, 505 U.S. 144, 168 (1992) (explaining that attaching conditions to funds disbursed under the Spending Clause is a "permissible method of encouraging a State to conform to federal policy choices"); *Md. Psychiatric Soc'y, Inc. v. Wasserman*, 102 F.3d 717, 719-20 (4th Cir. 1996) ("By virtue of its spending power, Congress is permitted to condition receipt of federal funds upon certain state actions."). To be valid, Spending Clause legislation must meet several requirements: (1) "'the exercise of the spending power must be for the general welfare,'" (2) "the conditions must be stated unambiguously," (3) "the conditions must 'bear some relationship to the purpose of the federal spending,'" (4) the conditions "must not violate some other constitutional command," and (5) "'the financial inducement offered by Congress must not be so coercive as to pass the point at which pressure turns into compulsion.'" *Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491-92 (4th Cir.

2005) and *Litman v. George Mason Univ.*, 186 F.3d 544, 552-53 (4th Cir. 1999)). Plaintiff fails to explain how the Department's designation of Plaintiff as a "high-risk" entity on a reimbursement payment model violates those factors. Nor could it.

For starters, Plaintiff failed to identify any condition that was placed on it as a predicate to receiving funds. Instead, as explained by the Murray Declaration, the conditions relate to the *manner* in which disbursements are made, not to Plaintiff's entitlement to funds from the federal government. Regardless, equally broad anti-discrimination requirements have been upheld on judicial review amidst Spending Clause challenges. *See, e.g.*, *Lau v. Nichols*, 414 U.S. 563, 569 (1974) (upholding the ban on race discrimination in federally funded programs under Title VI of the Civil Rights Act) (although partially abrogated on other grounds, *see Alexander v. Sandoval*, 532 U.S. 275, 285 (2001), the Spending Clause analysis in *Lau* remains intact). Banning discrimination based on sex presents an equally compelling circumstance as banning discrimination on race. Indeed, the Fourth Circuit has held that conditioning Title IX federal funds on an educational institution's prohibition from discrimination on the basis of sex does not violate the Spending Clause. *See Litman v. George Mason Univ.*, 186 F.3d 544, 553 (4th Cir. 1999) (finding no Spending Clause violation in Title IX case when "Congress has attached at least two conditions to GMU's receipt of Title IX funding: (1) GMU cannot discriminate on the basis of sex, *see* 20 U.S.C. § 1681(a), and (2) when responding to alleged acts of discrimination, GMU waives its Eleventh Amendment immunity, *see* 42 U.S.C. § 2000d-7(a)(1)."). Against this legal backdrop, Plaintiff's cannot plausibly show a Spending Clause violation where the Department's conditions were the result of its finding that Plaintiff illegally discriminated on the basis of sex and failed to voluntarily modify its policies. Likewise, it is not coercive. Indeed, Plaintiff's assertion of coercion, with a less than 5% potential budget impact, is even less than the Spending Clause challenge the

Supreme Court rejected in *Dole*. *See* 483 U.S. at 211 ("When we consider, for a moment, that all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% of the funds otherwise obtainable under specified highway grant programs, the argument as to coercion is shown to be more rhetoric than fact."); *see infra* n. 2.

### B.     Plaintiff Has Not Met its Burden to Establish Irreparable Harm

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added). Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) ("The plaintiff must make a clear showing of irreparable harm and the required irreparable harm must be neither remote nor speculative, but actual and imminent."). Moreover, injuries "in terms of money, time and energy necessarily expended in the absence of a stay" do not constitute irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). While irreparable harm involving money damages can be shown "when loss 'threatens the very existence' of a plaintiffs' business," *RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46-47 (D.D.C. 2009), such extreme circumstances are not present here.

Plaintiff fails to make this showing in multiple respects and that alone is sufficient to deny their request for such extraordinary relief. To start, Plaintiff has not adduced any evidence to show that placement on the reimbursement method will eliminate the programs. At most, Plaintiff has only alleged that it relies on these federal funds. *ASB v. McMahon*, Compl. ¶ 59; *FCSB v.*

*McMahon*, Compl. ¶ 58.[2] Further still, nowhere in its Complaint does Plaintiff allege that it will discontinue or end the programs supported with this money. Moreover, even with Plaintiff's eleventh-hour declarations, *ASB v. McMahon*, ECF No. 17 and *FCSB v. McMahon*, ECF No. 16, neither declarant states that without this money the programs cannot continue. That only confirms that Plaintiff does not face irreparable harm.

Further underscoring the lack of irreparable harm is that ED's high risk designation does not freeze or otherwise cut off access to the funds. All it requires is that the entity seeks reimbursement for costs already expended. In fact, as Plaintiff's declarant confirms, this reimbursement process is something that already happens as many of programs receive money on a reimbursement basis rather than as generalized allotments. *E.g.*, *FCSB v. McMahon*, ECF No. 16, Burden Decl. at ¶ 5.a ("FCPS is ***reimbursed*** on a monthly basis." (emphasis added)); *ASB v. McMahon*, ECF No. 17, Hawkins Decl. at ¶ 5.a ("APS is ***reimbursed*** on a monthly basis. (emphasis added)). There can be no finding of harm when payments can continue to be made, and Plaintiff already receives monies through the reimbursement process.

In the end, because Plaintiff alleges monetary losses that can be readily compensated at the end of the litigation (and indeed will be reimbursed by Defendants themselves), there is no irreparable harm here. *See Strauss v. Peninsula Reg'l Med. Ctr.*, 86 F.3d 1152, 1996 WL 265928,

---

[2] It's unclear how Plaintiff can establish such a reliance interest on these federal dollars considering the sheer size of their operating budgets. For the Fairfax School District, the $167 million is 4.51% of its total budget ($3.7 billion). Fairfax School District "FY 2025 Approved Budget," https://www.fcps.edu/sites/default/files/media/pdf/FY-2025-Approved-Budget.pdf (last accessed Sept. 2, 2025). For the Arlington School District, the $23 million is 2.72% of its total budget ($844.6 million). Arlington Public Schools, "FY 2026 Budget Development," https://www.apsva.us/budget/#:~:text=The%20FY%202026%20Adopted%20Budget,the%20FY%202025%20Adopted%20budget (last accessed Sept. 2, 2025).

at *1 (4th Cir. 1996) (explaining that "[m]onetary loss . . . does not constitute irreparable harm unless the loss cannot 'be ascertained with any accuracy'").

### C.    Plaintiff Has Not Shown that the Equities and Public Interest Justify Injunctive Relief

To obtain an injunction, Plaintiff must also show that the public interest and the balance of equities favor relief. In cases like this, where the government is a party opposing relief, these two factors merger. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff, having failed to demonstrate imminent irreparable harm or likely success on the merits, fares no better as to the public interest at stake.

Here, the public interest in allowing the democratically accountable leaders at ED to exercise their discretion to spend a lump sum appropriation in the way they determine best serves the American people and the objectives of Congress is significant. Once ED distributes these funds for an entity on high risk status, it is nearly impossible to recover that sum later if ED determines that the payment was erroneous. On the other hand, Plaintiff has not provided any evidence of irreparable harm, so the balance of equities weighs in favor of the United States.

## II.    Any Preliminary Injunction this Court Issues Should Address Bond

Should the Court find that Plaintiff has met its burden under the *Winter* factors to receive the requested relief, the Court must next consider the matter of bond. Per Federal Rule of Civil Procedure 65(c), a "party seeking a preliminary injunction prior to the final adjudication of liability must post a bond in order to ensure a source of recovery in the event that the injunction is erroneous." *S&D Land Clearing v. D'Elegance Mgmt. Ltd.*, 34 F. App'x 885, 895 (4th Cir. 2022). The bond requirement must be expressly addressed by the Court, and it cannot "disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (reversing district court's granting of injunction for failing to order bond in trade secret

misappropriation action). The amount of bond "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party from harm it suffers as a result of an improvidently issued injunction or restraining order." *Id.* at 421 n.3.

In keeping with precedent, a bond order should reflect the disruption caused to ED—particularly when it is deprived of the ability in a reimbursement payment scheme to flag anomalies. Without the ability to identify anomalies, there is a risk that an erroneous payment is made, and ED is deprived of the ability to recoup that money from Plaintiff. Accordingly, bond should be set at an amount that reflects the risk that the public fisc is being expended in a manner inconsistent with Congress's express goals.

## CONCLUSION

For all these reasons, this Court should deny Plaintiff's motion for a temporary restraining order and preliminary injunction.

//

//

//

Dated: September 2, 2025

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney

By:     _____/s/_____

MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3741
Fax:    (703) 299-3983
Email: matthew.mezger@usdoj.gov

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Civil Division, Federal Programs Branch

GARRY HARTLIEB
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0568
E-mail:  Garry.Hartlieb2@usdoj.gov

*Counsel for Defendants*